All right, we'll begin argument in our first case, Qaimah v. McHenry Thank you, Your Honor, and may it please the Court. My name is Joe Colley, and I represent the petitioner, Mr. Muhammad Qaimah, in this case. Mr. Qaimah was repeatedly raped over a period of six years by a Jordanian public official, both on video and at gunpoint. He raises three basic claims on appeal. First, whether there is a nexus between his imputed homosexuality and his past and fear of future persecution. Second, whether the agency weighed the regulatory factors before analyzing his cat claims. And finally, whether he suffered a permanent and continuing harm that entitles him to cat relief. The government agrees that this case should be remanded because the agency analyzed each of those claims in the wrong way. But I'd like to take those issues each in turn, because we disagree about how exactly that remand should occur. I'll start with the regulatory factors, because on that issue, we in the government actually agree that this issue should be remanded. You're opposing any remand in this case? We are asking for remand about the regulatory factors. So we agree that the regulatory factors should be sent back. But then we ask that for the asylum claim, that the court remand with instructions finding a nexus between his imputed homosexuality and his past. So you want to remand, but you want us to give instructions on the nexus issue? Yes, Your Honor. Can I, about the nexus issue, I'm just having a little trouble tracking the imputation claim, because this isn't like a standard imputation claim. You're not arguing that the persecutor targeted your client because he thought he was gay. And you're not arguing that at the time, anybody else thought he was gay. And so I'm just sort of struggling to understand the logic of your claim. Can you explain to me how what happened to your client was because somebody thought he was gay? Yes. So for the past persecution piece, so the reason why Mr. Kima was targeted after that first abuse in which that abuse was videotaped is because his abuser, Abdul, used the videotape as a way to- I get that. But the videotape wouldn't have worked if anyone already thought he was gay. It seems almost like for this plan to work, for the tape to be leveraged, it has to be the case that people don't already think he's gay. So I just, I think I'm maybe not phrasing my question right, but I really am struggling to understand the imputation part of this. So the issue with Abdul specifically is not whether or not he thinks Mr. Kima is gay. It's whether he's using the videotape because of the fear that other people might perceive Mr. Kima as gay. At some point in the future. That's why he's using the videotape as blackmail, as extortion. So he's using Mr. Kima's present fear of other people finding out that he's gay to continue holding him in submission and continue raping him. That's why Mr. Kima was targeted for a period of six years and why he didn't move on to another individual. He used that fear that others would come to perceive him as a homosexual to continue raping him. And so that was one central reason for- So what's the protected characteristic? Imputed homosexuality. But you just said that's not the reason why the persecutor persecuted him. It's not because of imputed homosexuality. It's because the victim has a fear that the videotape would be shown to other people who might think that? Well, it's the fear that, excuse me. So his abuser is using his categorization as an imputed homosexual to continue raping him because of the existence of the videotape. And the fear is that other people will perceive him as a homosexual, that he will be an imputed homosexual, in other words, because of the existence of that videotape. Does this go to your asylum claim or to your cat claim? This goes just to the past persecution for the cat claim, or excuse me, for the asylum claim. Because on the future side of things, so even if this court rejects the imputed homosexuality categorization for that past piece, there are people who already perceive Mr. Kima as gay regarding that alternative future fear of persecution, and that he will be subject to discrimination or persecution if he's returned based off of that future fear. In the record, we already have that Mr. Kima testified that his ex-wife still lives there. Is she one of the persecutors he fears? No, so the fear is whether there will be someone who finds out that he's gay and will come to discriminate against him. And so it's not his ex-wife specifically, but it's the fact that his ex-wife perceived that he's gay shows that there's already people in Jordan who perceive he's gay, and it's important when we're talking about Jordan to recognize the societal conditions there. This is a country where- Well, for purposes of your cat claim, you've got to prove that it's more likely than not that Abdul would show up at some point and resume his unfortunate behavior. And, I mean, it's- just for purposes of the cat claim, I suppose it's possible that Abdul would do that, but is it more likely than not that he would do that? You have the burden on this point. And so in- I'm just thinking about the likelihood of the future torture, and there are always things that might happen, but things that might happen are not more likely than not to happen. So, yes, Your Honor, that is the correct standard for the cat claim, but just specifically, if I may clarify about that future fear of persecution in the asylum context. So the standard there is whether- is as low as a- he needs to prove as low as a 10% chance of future persecution. And so that is the point that I was making as far as his ex-wife already perceiving he's gay and- One thing I'm wondering here is why did the agency not address the whole- the relevance and importance of the credit card conviction? Because the board did not make a finding about whether or not that that constitutes a particular serious crime. And so without that- Well, if we remanded, the whole question of the credit card conviction would have to come up, would it not? Yes, Your Honor. And we submitted arguments below, particularly as it regards to the role that his mental health plays on that. And fraudulent crimes, of which this is one, are generally considered crimes of moral turpitude and crimes- criminal offenses of moral turpitude are in turn considered to be aggravated felonies. Well, our position below was that, based on the mens rea of the statute, that that doesn't constitute an aggravated felony, but once again, the board didn't make a determination about that. So- But I mean, on a remand, the IJ, if it went back to the IJ, who'd have to make findings on the Catt claim, but they would also have to address this credit card conviction and whether that made him deportable on aggravated felony grounds. Yes, Your Honor. The IJ would have to address that once this case is remanded, and we don't disagree that that's the case. Yes, I mean, you know, I'm just not sure how much you're going to get out of a remand. You don't have any particular reservation about it, but you're going to have to carry your burden, as a matter of fact, under the Catt claim, and you're going to have to- A remand wouldn't imply that we thought the board had gotten the nexus argument wrong. We would have to reexamine that, and between examining the nexus argument on remand and examining the credit card conviction and the Catt standard, these Catt claims aren't routinely granted, things might not work out very well for you. There's a lot of stuff that you're going to have to contend with. Yes, and we're prepared to do that on remand. And turning back to the asylum claim specifically, because I'd like to focus a little bit more in on the reasons why he has a future fear of persecution. So not only did he testify that his ex-wife already perceives he's gay, both of Abdul and Anas' abusers, their extended families were aware, they harassed and threatened him during the prosecution. Tribal elders from his village are aware. Prosecutors, the Grand Criminal Court, and the Jurassic Provincial Directorate are aware. I thought the IJ acknowledged that Petitioner told people these two men attempted to rape him, and that's what people know, and he specifically didn't say they did because he was concerned about this, and the IJ acknowledged that. And then the IJ was focused on would this persecution that had allegedly occurred because of a characteristic occur in the future. And because not even the persecutor, the past persecutor, had this motivation as one central reason in the past, the IJ and the BIA found there was no reason to think that they or anyone else would in the future with this motivation. So what's your response to that? So regarding those two points that the immigration judge made, regarding whether Mr. Khamenei told anyone that Abdul and Anas raped him, it's kind of besides the point because the videotape exists, so if people learn about the videotape, which shows him engaging in The BIA already said he says that people might find out in the future because of the criminal case, but I think that's speculative. There's not evidence to support it. So what's your response to the BIA's point that this is speculative? It's not speculative because Abdul has already done this in the past. He invited Anas along with him to rape Mr. Khamenei. But between, if I'm remembering the dates right, your client reported this in 2011 and then left the country in 2014, but in those three years there were no further problems. And then when he, on his own volition, goes back to Jordan three times for a month each time, he is approached by Abdul, but when he doesn't get in the car, that's sort of that. So the fact that Abdul did this in the past, there doesn't seem to be a lot of non-speculative concern that he will do it in the future. Well, addressing that first time gap, Mr. Khamenei was waiting to cooperate in that prosecution of Abdul and Anas, and once he realized that Abdul faced no consequences and that Anas kind of got off on an easier punishment than he had expected, at that point was when he left the country. And then he came back to achieve three limited goals, the first marriage, the second divorce, and the third to finish a final class. And it was on that third and final trip in which Abdul showed up at his university two hours away from his village, was able to find him, stalked him, and tried to get him to get in the car with him. And so it was on that point that Mr. Khamenei realized that relocation was no longer possible and he hasn't been back to the country since. And so it's not speculative because we already know that Abdul can and has found out where Mr. Khamenei will be. He works for the government in Jordan, so he has this ability to find him, track him down, and stalk him. And just because he didn't do anything to him physically on this last occasion does not mean that there's at least a 10% likelihood or that it is more likely than not that he will torture him going forward. I mean, we're talking about his abusers who raped him over a period of six years at gunpoint, at knife point. He brought along a friend and they kidnapped him in the light of day and had him at knife point. And even after this, even after Anas did receive a punishment, Abdul received no consequences. So this is an individual who has no fear of the consequences. In fact, even after this was reported, even after this first investigation and prosecution, Abdul still showed up at his university two hours away and threatened him and tried to get back into the car, and tried to make him get back into the car. So our position is that this is an individual who's already inflicted severe harm to Mr. Khaimah and has shown a proclivity to know how to find Mr. Khaimah and to show up and threaten him again. And so we think that the likelihood of Mr. Khaimah's future persecution and future torture are both very high. So we ask this court to remain with instructions, finding that nexus, and to remand that cat claim back for the agency to reconsider all of the evidence. Thank you. Judge Harris, do you have any further questions? Judge Rushing? Thank you. All right. Mr. Nardi? Good morning, Your Honors. And may it please the court, Anthony Nardi on behalf of the Attorney General. Your Honors, our position has been the same throughout the course of this litigation for this court. We believe the court should remand this case. Can you speak up, please? Yes. Sorry. We believe that this court should remand the case back to the agency for further analysis of petitioner's eligibility for asylum withholding and cat protection. Can I ask you about, it sounds like the parties disagree about whether the agency said enough about nexus. You think they didn't and should get a chance to say more. The petitioner thinks they addressed every argument but just did it incorrectly. On the cat claim, it sounds like you all disagree about the theory that past torture could have these forward, could have continuing effects that counts as torture. You disagree about that but you all agree that the agency failed to consider all the cat factors? Am I getting that correct? Correct, Your Honor. Yes. I wanted to ask about that, about the cat factors. You claim the court or the agency didn't address, didn't weigh his past torture claim, his inability to relocate, or the country conditions. Your Honor, I think we specifically state that there's no express finding in the record that petitioner suffered past torture, that the conduct he suffered rose to the level of torture in the past. It didn't seem like anyone was disputing that the conduct was torture, it was rape. The agency discussed, the IJ discusses the likelihood of future rape. It assesses the past harm, when it stopped, whether he has avoided it since then. That was the basis for the agency's decision. It doesn't seem like addressing whether that rises to the level of torture or not was necessary. Then on relocation, page 100 of the JA, the paragraph about relocation. You're wrong about that. Then when it comes to country conditions, the agency, the IJ expressly didn't get into government acquiescence. Correct. He flagged. I'm not talking about that because I don't have to talk about issues that aren't necessary to the outcome. I've already found there's not a likelihood of future torture, and there's only two people who the petitioner claimed would torture him, Abdul and his father. He said, I've already found neither one of those people is likely to torture him in the  Country conditions, the evidence of what's generally going on in the country, didn't seem relevant. That might be relevant to government acquiescence. You point to impunity for crimes against homosexual people. That might be relevant if you were concerned about other people outside of these two, or if we're talking about government acquiescence in their behavior. But I don't see why the fact that the agency didn't talk about country conditions evidence would be dispositive here. Your Honor, I would limit my answer. I think with respect to our remand, the only point we agree with petitioners on is expressly that the agency did not make an express finding that the past rapes constituted torture. Why does that matter? Your Honor, because under the regulatory factors, it is something that needs to be considered. I agree with you that it does seem that the IJ, in doing that analysis, she assumed that that had been torture in the past. Therefore, that's why she moved on to looking to look at likelihood in the future. The only point of agreement between the parties here is that there was no express finding on that point. But we don't remand for nothing to happen. I know our court doesn't have precedent on what exactly are the factors that we consider when we acquiesce to a government request for remand without acknowledgement of error. But other circuits do have precedent on that, and none of them just grant a government request for remand without acknowledgement of error if it's going to serve no purpose. They say things like we have to be persuaded that it would be accomplished something, or even some courts set the bar as low as it has to be non-frivolous. But it seems pretty frivolous if you just send it back to make a better opinion, but you acknowledge that the issue you're sending it back for would not change the outcome. If the IJ has already, as you just said, implicitly acknowledged this, and it wouldn't change anything. Everyone knows that that's torture. Your Honor, two responses. First, I would say we're not only requesting remand in this case based off CAT. I think there are other parts that would be able to be fixed up on remand. But also, even with respect to CAT, we cite to the Ninth Circuit's decision in Bent v. Garland that looks at the frivolous level for voluntary remand. And we think here it's not frivolous because both we are conceding, we're not conceding error in the ultimate discretion, or excuse me, not discretionary, the ultimate denial or granting of relief. We are stating that there was some error in the analysis itself, maybe not particularly in this case of CAT, but we do think there were other errors with respect to nexus and well-founded fear. So you're not acknowledging error in the bottom line, in the disposition? Correct, Your Honor. We just think the agency's decision lacks the essential analysis necessary for us to defend the individual pieces of this case that get to the conclusion. And on nexus, the petitioner disagrees with you on that. He says the agency did say enough and just got it wrong. Correct, and we think the evidence in the record is equivocal enough that this court should directly remand the case. However, in those directions, instead of expressly stating how the agency should find, essentially stating that nexus has been met, we think the court, as it has in the past, remand for analysis of all of the evidence in the record as to that point. And we acknowledge the result could be the agency denying that nexus has been met, but it would be considering all of the evidence that points to the nexus analysis. What if we just think the agency didn't do anything wrong? Why would we acquiesce to your request for a remand then? Your Honor, it's entirely within the discretion of this court to deny the petition and deny the motion and our position on remand. We don't dispute that at all. Sometimes when we've confronted cases that seem to be a little bit of a mess, we've granted a joint motion to remand and reset the clock to square one and say, okay, here are the parameters and get this case straight. And so if we grant the remand, it would be possible to put some conditions on it, on the remand. And we would say, I think, that the remand does not imply that the agencies, one way or another, that the nexus finding was wrong. It started all over. And also, there's no impediment to having the IJ look at the credit card conviction. There's a conviction for credit card fraud out there. There's no impediment to having the IJ and the board look at that conviction and decide whether it qualifies as a crime of moral turpitude, which is a deportable offense.  And the remand, a lot of times we would say that we're not remanding and implying anything about the agency's position or the government's position, whether it's correct or whether it isn't correct. But it seems to me that at some point, you can conclude that the case is really a bit of a mess and that the presence of a joint motion for remand is that the parties want to straighten it out. The drawback to the remand is that it just lengthens the time, but you don't see any problem with putting a remand, but attaching conditions to the remand and say, start the clock over and address these issues.  And that's, I think, the main disagreement between the parties here today is that I believe my friends on the other side would have the remand direct the agency to find a certain way as to those elements, and we would say, no, you should remand to the agency for the agency to consider that looking at all of the evidence in the record. Is there a joint motion to remand here? I thought it was an opposed motion. Correct, Your Honor. Right. Courts apply a very different standard to an opposed motion for remand. The petitioner does not want to go through all of the process again, right? He wants to win on some points. Yes, Your Honor. I would note that in the petitioner's opening brief, at eight different points, they did also agree that the court should remand this case. They think that that remand should expressly state how the agency should rule on those issues. We think that remand should just state the agency needs to reconsider those issues and fully express their rationale looking at all of the evidence in the record. Right. When the parties agree, we sometimes will rule without any reasoning, right? Just do it all over again, even though we don't think you did anything wrong, but the parties agree, so we go along with it. But when the parties don't agree, that's not typically how courts proceed, is it? I agree those are different standards, and we are clearly in the opposed remand world. Yes. Can I ask you a question? Judge Rushing asked you at the beginning, tried to sort of lay out where the parties agree and where they don't agree, and I had a question on the cat claim. Does the government think we should adopt Mohammed so that a permanent mental harm, even if there's no likelihood of recurrence of the actual rapes, or not a sufficient likelihood of a recurrence of the rapes upon return, the sort of permanent mental harm might be enough to warrant cat relief? Your Honor, unfortunately, under Chenery, I don't think I can take a position on that. The agency did not do the analysis of whether or not that is the law. They simply stated that that is not binding on them because it is Ninth Circuit precedent, and they were sitting over a Fourth Circuit case. Are you sure? It seems like they said we're—I was confused. We're not convinced by the respondent's assertion that the severity resulted in ongoing harm amounting to torture. That seems like they did address it. I agree, Your Honor, and to the extent that this Court wants to get into that, we think Mohammed and those other cases are fundamentally different than the case here. Namely, in Mohammed, the harm at issue was female genital mutilation, which clearly has ongoing repercussions. However, specifically with respect to the state action prong, which here the agency expressly did not address under Baghbazbad, however, in those cases like Mohammed and the other case they cite, KB Gonzales and the matter of YTL, in those cases, there was no question of state acquiescence to the torture because it was either being done on such a widespread basis or was being done by the state itself. And so I think Petitioner's statement that it's simply necessary for this particular harm to exist, that gives rise to the CAT claim without any analysis of any other factor, we don't agree with that. Okay. And to constitute torture, doesn't the act have to be against someone in the offender's custody or control? Yes, Your Honor. The Ninth Circuit cases state that even once that's been done because of the mental and emotional effects of that trauma, it constitutes torture into the future. We don't think the court should adopt that position. That it's future. I thought the Mohammed court flagged in a sentence or two that ongoing experience may be enough to establish, but it didn't actually make a holding or analyze the requirements for torture. Correct, Your Honor. It speculated that maybe one day this might be enough. It was nebulously dealing with it. No court has so held. Not to my knowledge, Your Honor. And I would also note that the KB Gonzalez court and the outer YTL were dealing with the asylum thresholds or persecution standard in the withholding context, not torture. And that seems really different to me because in the asylum context, there's sort of a range of abuse that might qualify as persecution, but on the torture side, sort of by definition what is happening to the victim is really, really atrocious and terrible, and it is hard for me to conceptualize how something that amounts to torture would not likely at least produce permanent mental harm. I mean, I'm just wondering if... ..whether this would, if we expanded the sort of humanitarian asylum idea over onto the torture side, whether we're going to end up more or less eliminating the requirement of future, a likelihood of future torture. Your Honor, I agree with that analysis. I don't think the agency has had an opportunity to fully address that, though.  But if there are no further questions, I think I'll close. Judge Harris, do you have further questions? We don't have no further questions. Thank you, Your Honor. Mr. Birch, you have some... Mr. Colley, you have... She says, Mr. Colley or Mr. Birch. At any rate, you have some rebuttal time. Thank you, Your Honor. Just a few brief points. So, first, jumping into that, the centrality of the reason why it matters that the agency below did not specifically address whether that ongoing rape was past torture is because that factor and those regulatory factors is the greatest factor that indicates a likelihood of future torture. So that is a central part of the analysis. Right, but there's the fact and then there's the legal torture definition. It's like, if the IJ thinks this is not going to happen in the future, whether it's torture or not, then he doesn't need to move on to discuss whether it qualifies as torture, right? Well, there's no... Use the word implicit. There's no explicit acknowledgement. And given the centrality of that factor to the claim, we think that it's important that the IJ... But why, if the IJ says, this is not likely to happen? Why does it matter? Because we can't go off the presumption that they actually did evaluate the past torture if they don't say that they did. And so without that indication at all that they did acknowledge that it was past torture, we may all think that that rape is past torture, but without... With respect to the torture claim, Judge Rushing made the good point that we've been far more likely to find torture where the individual to be tortured was somehow under the custody or control of the person who would inflict the torture. But in this case, Abdul, such as he is, is at large and the like, but doesn't... Isn't there a danger of expanding cat claims to situations where there may be animosity at large as opposed to situations where someone would be under the custody of someone else, either some form of confinement or sharing an abode or whatever? That would be one of the factors that we would look at. And just the fact that someone was at large might do this would be in danger of expanding the basis for a cat claim in these circumstances. So I don't think there's a risk of expanding the cat claims too much. I think your point does go to the relocation factor as lined up in the regulatory factors. But I think, once again, the central point here is that that past torture is the best proxy for the likelihood of future torture. And without the immigration judge explicitly saying whether or not this constituted past torture, it's unclear whether that was actually considered in making its ruling about future torture. And so our position is that on remand, the agency should at least explicitly make findings regarding that past torture, whether that was past torture, and how that impacts the analysis of the future likelihood of torture, as well as the country conditions, which it also did not really address below. It really only addressed that relocation piece. Why are the country conditions relevant to whether Abdul or Petitioner's father would torture him? They're relevant to whether Abdul would... It's really relevant to the acquiescence piece, I think. Right, government acquiescence, which if the agency found there's no future likelihood of torture and then expressly said, so we don't have to talk about government acquiescence because we found no likelihood. Well, I think, once again, it goes back to that past torture and the fact that they didn't explicitly reference whether or not this was past torture. I think without that touchstone, that central point that is kind of the most important piece for that, that all factors kind of get a little fuzzy because of the fact that the immigration judge and the agency just didn't consider that point. I'm trying to think how to frame this. The fact that the agency didn't consider whether this was past torture, it does seem to me to be a bit of a hole in the analysis because it meant that the agency never had to sort of think about how horrifying what happened was. And I can see why you might be concerned that that would... You know, the fact that they never have to delve in to what actually happened to your client, which was quite horrific, means that they can say something like, well, we don't think the severity wasn't severe enough to result in ongoing harm. And so I see it as sort of like a rhetorical absence, but logically speaking, I really am struggling with... I guess I'm really just repeating Judge Rushing's question. Given a finding that whatever happened, it's not likely to happen in the future, I'm not sure, like, what would be added by that, logically, doctrinally, what would be added by that discussion? I think it goes back to the importance of knowing what the reasons were for the immigration judge's decision. So even if it is rhetorical, it's the key piece of the analysis. And so if we're not engaging with that key piece of the analysis, there's no way for us to fully see what the reasons were for that decision and for us to then try to decide whether or not that was the correct decision. And given this severe record of six years of rape, not engaging with that evidence does not really help with the analysis. Thank you, Your Honor. Do you have any questions? We have no further questions. Thank you. We'll come down and greet counsel and move right into our next case.
judges: J. Harvie Wilkinson III, Pamela A. Harris, Allison J. Rushing